UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LEGATO VAPORS LLC a Kentucky limited liability company, *et al.* | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| vs. | ) |
| | ) |
| DAVID  COOK in his official capacity as Chairman of the Indiana Alcohol and Tobacco Commission, *et al.* | ) |
| | ) |
| | ) |
| Respondents. | ) |

1:15-cv-00761-SEB-TAB

**ORDER ON PENDING MOTIONS**

This litigation challenges the constitutionality of Indiana Code § 7.1-7-1 *et seq.*, which places certain requirements on the manufacture of e-liquids used in e-devices sold in Indiana.  Petitioners Legato Vapors, LLC, Jet Setter Juice LLC, Rocky Mountain Ecigs LLC, and Derb E Cigs Indiana LLC and the Intervenor-Petitioner, the Right to Be Smoke-Free Coalition, Inc. (collectively referred to as "Petitioners") filed a Motion for Preliminary Injunction [Dkt. No. 55] and Motion for Summary Judgment [Dkt. No. 56] to enjoin enforcement of IC 7.1-7-1 *et seq.* and declare it unconstitutional.[1]   Respondents, the

---

[1] We mention here at the outset that Petitioners have left us somewhat confused as to the relief they are seeking from the court.  Petitioners framed this litigation initially in very broad terms, seeking to have us declare 23 separate sections of the Act unconstitutional.  [Am. Compl. at 19-20.] However, Petitioners' Motion for Summary is limited to "Section 9 of HEA 1432, as modified in part by Sections 8, 9 and 10 of SEA 463" and "Sections 1 through 6 of SEA 463" to be declared unconstitutional.  [Dkt. No. 56.]  Petitioners' Brief in Support of their Motion for Summary Judgment uses the word "Partial" in terms of the relief sought, although Petitioners do not specify which of their claims are subject to the motion, nor do they specify which, if any, claims remain. [Dkt. No. 63.]  In their Response to Respondents' Motion for Summary Judgment/Reply in Support of Petitioners' Motion for Summary Judgment, Petitioners state that they "are not challenging the

commissioners of the Indiana Alcohol and Tobacco Commission (the "ATC"), the Superintendent of the Indiana Excise Police, and the State of Indiana, along with Amici Curiae Indiana Vapor Co., LLC and Buy Rite, Inc. (collectively "Respondents") defend the Act, arguing in favor of its constitutionality and seeking summary judgment in their favor [Dkt. No. 70; Dkt. No. 90].[2]  For the reasons explained below, we **DENY** Petitioners' Motion Summary Judgment and **GRANT** Respondents' Cross-Motion for Summary Judgment and **DENY** Petitioners' Motion for Preliminary Injunction as **MOOT**.[3]

---

[2] vast majority of provisions in the Indiana statute that seek to protect consumers," including prohibiting teens from purchasing e-liquids, the restrictions on e-liquid ingredients, the child-proof cap and tamper evident packaging requirements, labeling requirements, and sample testing requirements.  [Dkt. No. 86 at 1.]  These requirements are included in Section 9 of HEA 1432, as modified in part by Sections 8, 9 and 10 of SEA 463.  In their conclusion, Petitioners request that we "declare the *challenged provisions* of the Indiana statute unconstitutional and permanently enjoin their enforcement," without providing any further description beyond "the security, clean room, and audit requirements."  [*Id.* at 34, 2 (emphasis added).]  Respondents Cross-Moved for Summary Judgment, seeking a final judgment.  [Dkt. No. 70 at 1, 41 ("The Petitioners have moved for summary judgment on each of their claims, but in the course of responding to Petitioners' motion the Respondent[s] have conclusively established that the Act passes constitutional muster in all respects.").]  Despite the confusion, our order resolves all of Petitioners' claims with regard to the constitutionality of Indiana Code 7.1-7-1 *et seq.*, as amended and Indiana Code 7.1-3-18.5-1, as amended.

[2] Several additional e-liquid manufacturers have requested to intervene in this action:  Cloudtown, LLC, DB Vapes, LLC, DNM Ventures, LLC, and Vapor Bank E-Liquid [Dkt. No. 93] as well as Licensed E-Liquid Manufacturing LLC and VapeIng LLC [Dkt. No. 97].  They seek to intervene "for the limited purpose of seeking a bond to secure themselves against the damage they would suffer if Petitioners' preliminary injunction request were granted."  The putative intervenors argue that they have invested significant resources to obtain permits from the ATC based on their compliance with the requirements of the Act.  [Dkt. No. 93 at 2.]  Because we are denying Petitioners' preliminary injunction motion, the motions to intervene are DENIED as moot.

[3] The parties agreed to consolidate their cross motions for summary judgment with Petitioners' Motion for Preliminary Injunction.  [Pet. Br. in Supp. at 2, n.1 (citing Dkt. No. 47 at § IX); Rep. Cross-Mtn./Resp. Br. at 1, n.1 (same).]  In their motion for preliminary injunction, Petitioners seek to stay the June 30, 2016 application deadline "in the event that this Court rules in favor of the Movants on the underlying summary judgment motion, but does not do so until after June 30, 2016."  [Pet. Mtn. for Prelim. Inj. at 2-3.]  Again, because we are denying Petitioners' Motion for

**Background and Undisputed Material Facts**

The parties have stipulated to certain uncontested facts [Dkt. No. 53], which we have incorporated in the following material facts as well as other facts that are likewise undisputed.

The statute at issue regulates the manufacture and sale of e-vapor devices. E-vapor devices, designed to evaporate (or aerosolize) an e-liquid, first arrived in the United States in approximately 2007. E-liquids typically are made from a mixture of propylene glycol and/or vegetable glycerin, flavorings, nicotine and water, and are sold with a range of nicotine concentrations, including nicotine-free. Although e-liquids may contain nicotine, as extracted from certain plants, e-liquids do not contain tobacco and do not generate smoke because there is no combustion. E-vapor devices are considered "tobacco harm reduction products," sometimes used to help stop tobacco use. The British government recently concluded that e-vapor products are 95% less harmful to humans than tobacco cigarettes; however, given the relative newness of e-liquids, long-term effects of their use has not yet been determined.

There are three major components of all e-vapor devices: a battery (usually a lithium battery), an atomizer, and a fluid-filled cartridge or tank. The atomizer has a heating element that uses the battery's power to evaporate the e-liquid solution in the cartridge or

---

Summary Judgment prior to June 30, 2016, the Movants' Motion for Preliminary Injunction is DENIED as MOOT.

tank.  Once the e-liquid is heated and vaporized, the user inhales the vapor through a mouthpiece creating a flavor and sensation similar to smoking a traditional cigarette.

There are two main categories of e-vapor devices.  The first category is designed to look like a traditional or "slim" cigarette – often called a "cigalike."  These devices have smaller lithium batteries that are disposable (used only once) or rechargeable.  Due to the lower battery power, their vapor production is relatively low.  Cigalikes are sometimes called first generation e-vapor devices, are referred to as "closed systems", and are sold mostly in convenience stores, gas stations, grocery stores, and pharmacies.  The following diagram illustrates these design features:



The second device category includes "eGos" and Vapor-Tanks-Mods ("VTMs"), which differ as to their size and shape, being somewhat larger than cigalikes.  These devices contain higher capacity and rechargeable lithium batteries that can produce relatively more vapor.  VTMs also provide the user with variable voltage and/or temperature control settings that can regulate the quality of the vaping experience.  eGos and VTMs are often referred to as second and third generation devices and are called "open systems" or sometimes "vapor pens".  These "open systems" have tanks that are designed to be refilled with any type or flavor of e-liquid that is sold in separate bottles, as shown below:

 

As an alternative to tobacco cigarettes, e-vapor devices have enjoyed rapid growth, resulting in over 8,500 brick-and-mortar vape shops springing up around the country; at least 94 are located within the state of Indiana.  According to the managing member of two of the Petitioners, open system devices and e-liquids comprise 60% of the marketplace, whereas closed system devices comprise the remaining 40%.  [Decl. of Troy LeBlanc ¶ 5.] Vape shops typically sell open system devices; the industry generates $4.6 billion annually with estimates of projected earnings by 2020 reaching $11.6 billion.  Indiana's market share of revenue from open system devices and e-liquids is currently approximately $77.2 million per annum.  Approximately 164 out-of-state manufacturers account for 90% of name-brand e-liquids sold in Indiana.

The statute at issue originated with House Bill 1432, which was amended by Senate Bill 463 and codified as IC 7.1-7-1 *et seq.*  Following the commencement of this litigation, IC 7.1-7-1 *et seq.* was amended apparently to address some of Petitioners' challenges. Indiana Code 7.1-7-1, *et seq.*, as amended, is referred to herein as the "Act."  A video was presented to the General Assembly depicting a pharmacist testing open system e-liquids. One sample showed nicotine levels that substantially varied from the data on the label of the bottle and another sample proved to be untestable.  These results are problematic because nicotine overdoses can be toxic.  This information, along with the lack of any

federal regulation of e-liquids, prompted the Indiana General Assembly to enact the statute at issue here based on three primary purposes, to wit, "to protect public health and safety by: (1) ensuring the safety and security of e-liquid manufactured for sale in Indiana; (2) ensuring that e-liquid manufactured or sold in Indiana conforms to appropriate standards of identity, strength, quality, and purity; and (3) ensuring that e-liquid is not contaminated or adulterated by the inclusion of ingredients or other substances that might pose unreasonable threats to public health and safety." To that end, IC 7.1-7-4 requires "manufacturers", defined as "a person or cooperative, located inside or outside Indiana, that is engaged in manufacturing e-liquid" (IC 7.1-7-2-15) to obtain a permit from the ATC before June 30, 2016, "before mixing, bottling, packaging, or selling e-liquid to retailers or distributors in Indiana." IC 7.1-7-4-1(a).[4]

An application to obtain a permit requires, among other things, evidence of: a "clean room space where all mixing and bottling activities will occur" (IC 7.1-7-4-1(d)(1)(A)) and which complies with Indiana Commercial Kitchen Code (IC 7.1-7-2-4), a service agreement with a single security firm (i.e., subcontracting is not permitted) valid for five years (IC 7-7-4-1(2)), and consent to allow the ATC to inspect the manufacturing location and take samples of the product(s) manufactured there (IC 7.1-7-4(d)(10)). The security firm must employ employees accredited or certified by the Door and Hardware Institute as

---

[4] "[The]ATC interprets the Indiana statute as requiring an out-of-state manufacturer to obtain a manufacturing permit under the Indiana statute if it sells e-liquids to: (i) a distributor or retailer located in Indiana; (ii) a distributor who is located outside of Indiana who then sells or distributes the product to a retailer located in Indiana; (iii) a consumer or end-user in Indiana over the Internet; and (iv) an out-of-state retailer who then sells the product to a consumer or end in user in Indiana over the Internet." [J. Stip. ¶ 13.]

an Architectural Hardware Consultant and the International Door Association as a certified Rolling Steel Fire Door Technician, and provide 24/7 offsite video surveillance, a high security key system with remote monitoring, and expertise in doors and locking systems. IC 7.1-7-4-1(d)(3).[5]

The Act regulates only e-liquids used in open systems, although the e-liquids used in open and closed systems are subject to the same production processes which, for some manufacturers, are conducted in the same facilities using the same equipment.  Although e-liquids do not contain tobacco, the Act defines "tobacco products" to include any "e-liquid that contains nicotine."  IC 7.1-1-3-47.5 (as amended); *id.* 7.1-6-1-3.  As a result, retailers of open system e-liquids must obtain a valid tobacco distributor license under Indiana tobacco regulations.  *See id.* 7.1-7-5-1(c).

Petitioners challenge the Act as a violation of the Dormant Commerce Clause, the Equal Protection Clause, and the Indiana Constitution.[6]

### Summary Judgment Standard

Summary judgment is appropriate when the record establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as

---

[5] Indiana Code § 7.1-7 contains a host of additional requirements which Petitioners do not challenge.  For example, e-liquid containers must use child-proof caps and tamper-evident packaging, contain labels identifying all active ingredients and designate if the products contain nicotine, and include a batch number, and include only statutorily-approved ingredients. Additionally, the manufacturer must store and maintain samples and consent to criminal history background checks for those persons listed on the application.  *See* IC 7.1-7.

[6] Petitioners advanced a challenge to the Act under the Due Process Clause arguing that no security companies in the country satisfy the requirements under the Act; however, Petitioners have now withdrawn this argument.  [*See* Pet. Resp./Reply Br. at 1, n.1.]

a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

When the issues presented are purely questions of law, as the case at bar, summary judgment standards nonetheless apply. *See Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 951 F.2d 757, 760 (7th Cir. 1991). Courts are often confronted with cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations,

courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). While cross motions for summary judgment may lead to a judgment without trial, the standard for determining whether summary judgment should issue is unchanged from that which applies when only a single party has moved for the relief.

## Discussion

### I.    Dormant Commerce Clause

Petitioners contend that the Act violates the Commerce Clause of the United States Constitution by attempting to impose these extraterritorial regulations on e-liquid manufacturing that is conducted entirely outside the state of Indiana. [Am. Compl., Count II, p. 13-14, 24.] According to Petitioners, Indiana's attempts to regulate under the Act the manufacturing of e-liquids wholly outside the state is *per se* invalid. [Pet. Br. in Supp. at 19-20.] They seek both declaratory and injunctive relief.

Respondents rejoin that the Act's regulations regarding the manufacture of e-liquids are not triggered unless the manufactured e-liquids are sold or intended for sale within the state of Indiana. As a result, the Act does not target commerce that occurs *wholly* outside the State. [Resp. Cross-Mtn. Br. at 12.] Respondents maintain that the Act is neutral on its face, in that it does not differentiate between local manufacturers and manufacturers located outside of Indiana, and in its effect and is rationally related to the state's legitimate and well-established goal of protecting the health and safety of Hoosier citizens within its borders. [*Id.* at 12-14.] Thus, it does not suffer from any constitutional infirmities.

A.    **Standard of Review**

The United States Constitution allocates to Congress the power to "regulate Commerce ... among the several States."  U.S. Const. Art. I, § 8.  Implicit in Congress's exclusive authority over interstate commerce is a restriction on states from doing intruding on that power.  *See New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273 (1988). Encroachments on the exclusive authority reposing in Congress are prohibited by the Dormant Commerce Clause.  More specifically, because it is intended to prevent economic protectionism, the Dormant Commerce Clause prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors ... Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down ... unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism ...."  *Id.* at 273-74, 90 S.Ct. 844; *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 903 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010)

States sometimes also run afoul of the Commerce Clause by seeking to regulate commerce which takes place "wholly" outside their own state, "whether or not the commerce has effects within the State."  *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989) ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside the State's borders is invalid under the Commerce Clause."); *Dean Foods Co. v. Brancel,* 187 F.3d 609, 614 (7th Cir.1999) (stating that it is "a fact well known" that extraterritorial legislation is barred by the federal constitution); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer,* 63 F.3d 652 (7th Cir.1995) ("[T]he Commerce Clause constrains a state

from projecting its economic legislation onto commerce wholly occurring in its sister states."); *Ripley*, 616 F. Supp. 2d at 903.

State laws affecting commerce fall into one of three categories.  First, laws that explicitly discriminate against interstate commerce, such as an Illinois statute that forbade the sale of spray paint manufactured outside of Illinois.  *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).  Such a law is *per se* unconstitutional based on its "disparate treatment" effect.  *Id.*  "The second category comprises laws that appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce."  *Id.*  For example, a state law limiting trailers to 55-feet in length when nearly all other states permit 65-foot long trailers; such a law would effectively place an embargo on interstate commerce thus violating the Dormant Commerce Clause.  *Id.* These laws also fall within the "disparate impact" category and are analyzed based on the test imposed by *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) (although the Seventh Circuit has expressed doubts as to the utility of the *Pike* test[7]).  The third category of state laws "affect commerce without any reallocation among jurisdictions – that do not give local firms any competitive advantage over those located elsewhere."  *Id.*  Laws in this third category are reviewed under the rational basis analysis.  *Id.*

---

[7] On more than a few occasions, the Seventh Circuit has recognized the challenges presented by the *Pike* balancing test when courts are called upon to "strike a fine balance between the burden that a particular state regulation lays on interstate commerce and the benefit of that regulation to the state's legitimate interests."  *Wiesmueller v. Kosobucki*, 571 F.3d 699, 704 (7th Cir. 2009). Judge Hamilton of that Court (and Indiana) has described the *Pike* analysis of determining whether a burden on state commerce is clearly excessive in relation to local benefits to be like asking "whether a blue race-car is clearly faster than it is blue."  *Lebamoff Enter. v. Huskey*, 666 F.3d 455, 468-69 (7th Cir. 2012) (Hamilton, J., concurring).

## B.   Extraterritorial Law/Disparate Treatment

The parties' dispute, properly framed, centers on whether the Act's regulation of out-of-state manufacturing of e-liquids for sale in Indiana constitutes the regulation of commerce "wholly outside" the state of Indiana, thus implicating the Dormant Commerce Clause prohibitions.   Petitioners describe the Act in terms of its having the "practical effect" of controlling conduct outside of Indiana, which, they say, makes it *per se* invalid. Respondents contend in response that the Act does not differentiate between intra and interstate commerce and also successfully passes a rational basis review.   We begin our analysis by discussing the issue of whether the Act is extraterritorial.

As repeatedly made clear by this circuit and others, and as Petitioners concede, there is no right to sell e-liquids in Indiana entirely free from regulation.   [Pet. Resp./Reply Br. at 12, n.7 (Petitioners "have not argued that they should be able to sell e-liquid in Indiana without being subject to *any* health and safety regulations.").][8]   The Ninth Circuit ruled that although "[s]tates may not mandate compliance with their preferred policies in wholly

---

[8] *See e.g., Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523-24 (1935) (New York may impose "sanitary precautions" on milk sold there, including from out-of-state farmers; certificates of compliance "may be exacted from farmers … elsewhere," and "milk may be excluded if necessary safeguards have been omitted"); *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101-03 (9th Cir. 2013) (California law on ethanol sold in-state did not regulate "out-of-state conduct;" it "regulates only the California market," saying nothing "about ethanol produced, sold, and used outside California"; however, California's law created financial incentives to sell certain quality ethanol whereas the Act here sets forth manufacturing requirements); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001) (Vermont labeling law for mercury-containing lamps sold in-state does not "require manufacturers to label all lamps wherever distributed" and "is 'indifferent' to whether lamps sold anywhere else in the United States are labeled or not"); *see K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 730-32 (7th Cir. 1992) (upholding Wisconsin uniform-price law for drugs sold to in-state pharmacies; "[s]o long as a seller charges the same price to all pharmacies in Wisconsin, it may do as it pleases in Minnesota or Micronesia").

out-of-state transactions, [] they are free to regulate commerce and contracts within their boundaries with the goal of influencing the out-of-state choices of market participants." *Rocky Mountain*, 730 F.3d at 1103.

In support of their argument, Petitioners rely on *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897 (S.D. Ind. 2009), characterizing the Act to "control and audit all aspects of the production process occurring beyond its borders", which the Dormant Commerce Clause prohibits.  [Pet. Br. in Supp. at 23-24.]  In *Ripley*, we considered the constitutionality of Indiana's Uniform Consumer Credit Code ("IUCCC"), which imposed Indiana licensing and regulatory requirements on lenders who solicited and made consumer loans to Indiana residents.  616 F. Supp. 2d at 901.  The plaintiff, an Illinois corporation with no business locations in Indiana, engaged in advertising and soliciting of Indiana customers, but its loan applications were accepted in-person only in Illinois, the loan documents were executed in Illinois, and loan funds were distributed in Illinois.  *Id.* at 900-01.  On this basis, we concluded that the transactions at issue occurred wholly within the state of Illinois which meant that the IUCCC directly regulated extraterritorial activity, thereby violating the Dormant Commerce Clause.  *Id.* at 905-06.  Discounting the significance of the lender's solicitations in Indiana and the fact that the loan proceeds were likely spent largely in Indiana, the Seventh Circuit affirmed, holding that because the contracts were made and executed in Illinois, Indiana's attempt to regulate these contracts violated the Dormant Commerce Clause.  *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 600, 669 (7th Cir. 2010).

The *Ripley/Mills* analysis focuses on the fact that the transaction was completed in "Illinois where loan documents were signed and [plaintiff] had tendered a loan payment in exchange for a promise to pay" and plaintiffs' only acts occurring in Indiana were solicitation efforts. *Ripley*, 616 F. Supp. 2d at 905-06. Here, in contrast, the sale (or purchase) of Petitioners' product must occur within the state of Indiana to trigger the Act's manufacturing requirements. As Respondents note, unlike *Ripley*, the Act does not prohibit an Indiana resident from travelling to another state to purchase an e-liquid product that is free from Indiana regulation. [Resp. Cross-Mtn. Br. at 15.] The facts in *Ripley* do not mirror those in the case before us.

Petitioners also rely on *National Solid Wastes Management Association v. Meyer*, 63 F.3d 652 (7th Cir. 1995) ("*NSWM*"), to support their argument that the Act's practical effect is to force manufacturers of e-liquids, which will never be sold in Indiana, to produce those e-liquids under the same conditions as e-liquids bound for sale within the state of Indiana. [Pet. Br. in Supp. at 25-26.] The statute at issue in *NSWM* required both in-state and out-of-state municipalities seeking to dispose of certain types of waste in Wisconsin landfills to adopt an approved "effective recycling program" in order to reduce the amount of waste disposed-of in Wisconsin landfills. *NSWM*, 63 F.3d at 655. The Wisconsin statute did not apply to individuals or individual companies, only to "regions" and "communities." *Id.* at 654. Accordingly, "all citizens in the effective recycling community [were required to] observe the statute's recycling provisions, whether or not they actually dump[ed] waste in Wisconsin." *Id.* at 655 ("Everyone in the community either must separate recyclables

14

or must use a materials recovery facility in order for *anyone* to receive access to Wisconsin's landfills") (emphasis in original).

Finding that the Wisconsin statute "essentially control[ed] the conduct of those engaged in commerce occurring wholly outside the State of Wisconsin and therefore directly regulat[ing] interstate commerce," the Seventh Circuit concluded that the Wisconsin statute violated the Dormant Commerce Clause. *Id.* at 658-61. The Court stated:

> The practical effect of the Wisconsin legislation is to impose the requirements of Wisconsin law on numerous waste generators who neither reside, nor dispose of their waste in Wisconsin; eighty percent of the out-of-state waste subject to this legislation is destined for non-Wisconsin landfills. Out-of-state waste generators who do not dump in Wisconsin but who are located in communities adhering to Wisconsin's "effective recycling program" must therefore bear the costs of complying with the Wisconsin law while their competitors in non-effective recycling communities, who may be dumping solid waste at the very same non-Wisconsin landfill, do not. The Wisconsin statute reaches across the Wisconsin state line and regulates commerce occurring wholly outside Wisconsin. As a price for access to the Wisconsin market, it attempts to assume control of the integrity of the product that is moving in interstate commerce. Wisconsin's approach to sound solid waste management, and no one else's, must govern, even when the product will never cross its borders. The Commerce Clause contemplates a very different market among the states of the Union.

*Id.* at 661.

The facts before us are quite different from those in *NSWM*. Here, only manufacturers of e-liquids who sell their product in Indiana are bound by the Act.[9] If a

---

[9] The Act also applies to sales by retailers and distributors who sell the e-liquids in the state of Indiana that was produced by an unpermitted manufacturer or by one that fails to adhere to the manufacturing requirements in the Act. IC 7.1-7-6-2(a).

manufacturer does not sell in Indiana, it is wholly unaffected by the Act and is not hamstrung in its competition with other non-Indiana-selling manufacturers. This is quite unlike *NSWM* where waste generators that did not dispose of their waste in Wisconsin were still required to comply with the Wisconsin legislation based on their location in an out-of-state "effective recycling community". Those waste generators suffered an economic disadvantage not experienced by generators that similarly did not dispose of waste in Wisconsin, but were exempt from the costs of the program based on their location *outside* an effective recycling community. It is undisputed that e-liquid manufacturers who do not sell their product in Indiana are not required to comply with the Indiana legislation. *NSWM* is therefore inapposite.

Respondents rely on two cases which upheld state labeling regulations: *International Dairy Foods Association v. Boggs*, 622 F.3d 628 (6th Cir. 2010) and *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). In *Boggs*, the Sixth Circuit upheld an Ohio labeling standard that had no bearing on how milk processors labeled milk intended for sale in states other than Ohio, even if the processors chose to standardize their labeling to comply with Ohio's regulation. Similarly, in *Sorrell*, the Second Circuit rejected arguments of light bulb manufacturers that Vermont's mercury labeling requirements were extraterritorial because they would be required to completely revamp their packaging operation to comply with the labeling law. The *Sorrell* Court found that the manufacturers' arguments were based on their unwillingness to differentiate between Vermont-bound and non-Vermont-bound lightbulbs. It held that the manufacturers' own business choices did not support a finding that the law was

16

extraterritorial. The Second Circuit concluded that even if manufacturers were convinced to withdraw from the Vermont market, the law would still not violate the Commerce Clause.

Petitioners attempt to distinguish these labeling cases by contrasting the extensive nature of the Act's security and sanitation requirements with the Ohio and Vermont regulations which "simply regulated labeling content". Petitioners argue that they cannot, as a practical matter, modify their production processes to distinguish e-liquids intended for Indiana from that intended for sale in other states. [Pet. Resp./Reply Br. at 910.][10] Petitioners seek to contrast these labeling cases on another ground, to wit, that Petitioners' challenge to the Act is "not based on broader incidental effects that are not explicitly regulated by the statute" (*i.e.*, costly or cumbersome compliance that unduly burdens interstate commerce) but "the application of the security and clean room requirements themselves to manufacturing activities conducted entirely outside of Indiana (*i.e.,* the fact that Indiana is expressly telling out-of-state manufacturers how to produce e-liquids and

---

[10] Petitioners argue that it "is not, and cannot be, the law" that "out-of-state manufacturers can avoid the extraterritorial effects of the statute by simply deciding not to sell product in Indiana." [Pet. Resp./Reply Br. at 12.] Relying on the Seventh Circuit's decisions in *Ripley/Mills* and *NSWM*, Petitioners contend that the plaintiffs in those cases could have foregone business with Indiana loan consumers (*Ripley/Mills*) or sent all their refuse to non-Wisconsin landfills (*NSWM*), but the Seventh Circuit did not require such. [*Id.*] Petitioners' position is a red herring. Those cases, as explained above, could not be remedied by refusing to do business in Indiana or in Wisconsin because the Court concluded that those companies were already *not* doing business in Indiana and Wisconsin. In those cases, the offending statutes reached business conducted in Illinois (loans made in Illinois to Indiana citizens) and outside Wisconsin (by requiring those who did not send their waste to Wisconsin to nonetheless participate in Wisconsin's recycling program). That is simply not the case with the Act. Here, out-of-state manufacturers do not have to comply with the Act if they choose not to sell e-liquids in Indiana. The Act places no restrictions on e-liquid manufacturers' sales outside the state of Indiana.

under what conditions)." [*Id.* at 10.] We are not persuaded by Petitioners' argument that the Act is distinguishable from the regulation in the labeling cases; however, because we are persuaded that the Act does not regulate activities conducted "entirely outside of Indiana", we need not discuss the labeling cases further.

Here, Indiana has enacted a law that does not mandate e-liquid manufacturing policies as to out-of-Indiana sales. As is well-established above, Indiana is free to place restrictions on the sale of e-liquids within its borders when these restrictions are indifferent to e-liquids sold elsewhere in the United States. The Act does not regulate commerce *wholly* outside the state of Indiana and, therefore, is not an extraterritorial law. Accordingly, we find that the Act is not *per se* invalid under the Dormant Commerce Clause.

### C.    Disparate Impact

Petitioners do not contend that the Act has a disparate impact on interstate commerce or that the *Pike* balancing test is necessary; however, in arguing that the Act is extraterritorial, Petitioners have interspersed arguments that fall more precisely under a disparate impact analysis, and thus we address those arguments under that rubric. The *Pike* test, although criticized by the Seventh Circuit, provides: "'Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' As often as this '*Pike* test' is cited, it is actually applied to invalidate laws in extremely rare cases."

*Panhandle E. Pipe Line Co. v. Madison Cty. Drainage Bd.*, 898 F. Supp. 1302, 1313 (S.D.

Ind. 1995); *see also Cavel Int'l v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007).

We start with the expressed "local benefits" of the Act, which are "to protect public

health and safety" by ensuring e-liquids are "not contaminated or adulterated by

[ingredients or substances] that might pose unreasonable threats to public health and

safety."  IC 7.1-7-1-2.  It is well-established that states have the responsibility to protect

the health, safety, and welfare of its citizens and are afforded great latitude to do so.  *United*

*Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43

(2007).  The Supreme Court has explained that when applying Dormant Commerce Clause

principles, a "common sense of our traditional recognition of the need to accommodate

state health and safety regulation" exists.  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306

(1997).  We find that the local benefits provided by the Act relating to the health and safety

of Indiana citizens are significant.

According to Petitioners, the Act imposes several intolerable burdens on interstate

commerce.  None of those burdens, however, can be viewed as excessive in relation to the

putative local benefits.  First, Petitioners argue that possible competitive advantages are

lost when a manufacturer of e-liquids sells its product within Indiana in addition to other

states because its entire production process must comply with the costly Indiana

regulations.  [Pet. Br. in Supp. at 26 (citing to *NSWM*, 63 F.3d at 660-61).]  The Seventh

Circuit, in recognizing the significantly limited bases on which a state law is deemed

violative of the Dormant Commerce Clause, has held that "the fact that a statute is

inconvenient or expensive for those involved in interstate commerce, or requests them to

change their preferred methods of doing business, does not render the statute violative of the commerce clause." *Panhandle*, 898 F. Supp. at 1313-14 (citations omitted). Petitioners' complaint is merely that:  an argument that the Act is inconvenient, expensive, and requires a change in the way they do business.  As taught by *Panhandle*, this is not enough to demonstrate a "clearly excessive" burden on interstate commerce. *Id.; see also Amanda Acquisition Corp. v. Universal Food Corp.*, 877 F.2d 496, 506 (7th Cir. 1989) (finding that a Wisconsin corporate law did not violate the Commerce Clause and, in fact, "[s]tates could ban mergers outright, with even more powerful consequences.").

Second, Petitioners posit that the Act will increase the "the chance that out-of-state manufacturers will be subject to inconsistent regulatory obligations." [Pet. Br. in Supp. at 27.]  However, Petitioners do not point to any statutes currently in conflict with Indiana's e-liquid manufacturing requirements. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 448 (1960) (holding that no impermissible burden is established based on the *possibility* of differing requirements without pointing to such a statute).  Said differently, no evidence in the record reflects that a manufacturer cannot comply with the Act without violating another state's regulations (or vice versa). *See Panhandle*, 898 F. Supp. at 1314 n.5 ("Regulations are 'inconsistent' in this sense not when they are merely different, but when one regulating authority requires conduct that another regulating authority forbids, such that the regulated entity cannot comply with both.").  Without such evidence, we cannot conclude that the Act presents an impermissible burden.

Third, Petitioners rely on *Ripley/Mills* to argue that although they have not demonstrated an impossible burden of complying with two conflicting e-liquid laws, the

effect of the Act is to exalt Indiana's public policy choices over those of states with less restrictive manufacturing requirements. [Pet. Resp./Reply at 19.] Relying on the Arkansas State Legislature's limited regulation of e-liquid manufacturing as an example, Petitioners characterize Arkansas' approach as "common sense." [*Id.* at 20 (the Arkansas law requires "hand washing sink," the "[c]leanliness and maintenance of e-liquid preparation and mixing equipment," and prohibits food, drink, and animals in the mixing areas).][11] The interstate commerce burden, as Petitioners see it, is that "Arkansas will not be able to effectuate the balance it struck between too little or too much regulation because Indiana, as a practical matter, has the final say" due to its more restrictive regulations. [*Id.* at 21.] Although we recognize that the Act may diminish the effect of Arkansas's policy choice to regulate e-liquids in a more minimalistic fashion, this is only true for manufacturers who choose both to (1) sell in Indiana *and* (2) overhaul their entire manufacturing process to comply with the Indiana standards; and only as to manufacturers who wish to sell their product in both Indiana and Arkansas.

Even if the potential for minimizing Arkansas's policy choices were considered a burden on interstate commerce, we are reluctant to consider this impact "clearly excessive" relative to the Indiana legislature's purpose of protecting the health and safety of Indiana

---

[11] Petitioners also rely on recent administrative rules promulgated by the authority of the Utah Code which contain similarly narrow requirements of good hygiene practices, easily cleanable surfaces, and proper storage of ingredients, but do not include the same security protocol, clean room, or kitchen requirements that are included in the Indiana Act. [Pet. Resp./Reply Br. at 17.] Additionally, Petitioners provide a survey of other states' sales restrictions pertaining to e-liquids, none of which, Petitioners represent, require the same security, clean room, and kitchen code standards as included in the Indiana Act. [*Id.* at 22, n.11.]

citizens.   This is the paradigmatic *Pike* conundrum, requiring a balance to be struck between Indiana's attempts to regulate an unregulated, unchartered territory in order to protect the health and safety of its citizens in what it calls a "dire and immediate" situation [Rep. Cross-Mtn. Br. at 25-26] with Arkansas's own efforts to navigate the same unsettled area in a different way.   The *Pike* test illustrates how ill-equipped courts are in terms of deciding which is more significant:   Indiana regulating potentially harmful e-liquids or Indiana stymying the policies of other states.   We cannot say that the Act's effect of being of the most stringent regulation among Indiana's sister states, assuming it does, inflicts a "clearly excessive" burden on interstate commerce.

Fourth, in minimalistic fashion, Petitioners argue that interstate commerce could be hampered if other states were to adopt statutes similar to the Act because e-liquid manufacturers would be forced to choose between states based on which one imposes the least burden and then supply e-liquids only to those states.   [Pet. Br. in Resp. at 28.] Expressing the concern that the regulatory impact of the Act will be wide and far reaching, Petitioners argue that out-of-state manufacturers will "bear the brunt of this [Indiana] statute" because, computed annually, $13.5 million of branded e-liquids sold in Indiana are manufactured outside the state.   [Pet. Br. in Supp. at 26-28; Pet. Resp./Reply Br. at 11-15.] This argument is inconsistent with Petitioners' other positions in this litigation.

The clearest "harm" imposed by the Act is that e-liquids will be more expensive to purchase in Indiana and/or that consumers in Indiana will have a diminished e-vapor selection to choose from.   [*See* Pet. Br. in Supp. at 4 ("For Indiana distributors and retailers who have benefited from the rapidly growing e-liquid sector, they will no longer be able

to sell these products within the State's borders.  And Indiana consumers who use e-vapor devices will ultimately bear the burden of facing a substantially reduced universe of e-vapor products from which to choose.")].  The Dormant Commerce Clause seeks to prevent one state from subjecting its regulations on interests outside the state.  Here, as Petitioners concede, the citizens and businesses of Indiana will bear the costs of the Act.  "There is no reason to step in and hand local businesses a victory they could not obtain through the political process."  *United Haulers Ass'n,* 550 U.S. at 345; *see also Nat'l Paint*, 45 F.3d at 1132 (opining that the "law-abiding residents of Chicago will be the losers" and that the "law may well be folly," but was still constitutional); *Sorrell*, 272 F.3d at 111 (noting that "[i]f lamp manufacturers were to withdraw from the Vermont market, only Vermont residents would feel any appreciable effect . . . [a]ny loss by residents of other states would be minor by comparison").  The Dormant Commerce Clause does not protect Indiana citizens from economically or socially unfavorable legislation within its own boundaries.

Applying the esoteric *Pike* balancing test, which is rarely used to strike down state statutes as unconstitutional, we conclude that the Act "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental."  *Pike*, 397 U.S. at 142.  The burden imposed on interstate commerce is not "clearly excessive in relation to the putative local benefits."  *See id.*  Consequently, we find that the Act does not have a disparate impact on interstate commerce.

### D.    Rational Basis

We have concluded that the Act is non-discriminatory, does not regulate extra-territorially, and has no "disparate impact" on interstate commerce.  As a result, the Act

need only satisfy the "normal rational-basis standard" to survive a constitutional Dormant Commerce Clause challenge, which it has done by passing the *Pike* balancing test. *Nat'l Paint*, 45 F.3d at 1131 ("No disparate treatment, no disparate impact, no problem under the dormant commerce clause."); *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 919 (7th Cir. 2003) (holding that laws that pass the *Pike* balancing "serve a legitimate state interest").

The Act's stated purpose, in the absence of federal regulations, is to protect public health and safety by ensuring the safety of e-liquids manufactured for sale in Indiana; ensuring that e-liquids sold in Indiana conformed to standards of identity, strength, quality, and purity; and protecting e-liquids from contamination or adulteration that might pose unreasonable threats to public health and safety. IC 7.1-7-1-2. Petitioners "do not quarrel with the legitimacy of these goals, . . ." [Pet. Br. in Supp. at 41] and the Act's strict manufacturing specifications reasonably further those goals. Specifically, the security requirements further the goal of preventing intentional tampering and sabotage, the clean room requirement furthers the goal of preventing contamination or adulteration, and the audit requirement ensures compliance with the manufacturing requirements. Under a rational basis test, a "legislature need not choose the least restrictive means of the regulation." *Nat'l Paint*, 45 F.3d at 1129. Indiana's manufacturing regulations pertaining to e-liquids sold in Indiana, although quite restrictive, are rationally related to the concerns to which the Act seeks to address.

Although Petitioners submit scores of examples in support of their position that the Act will not actually make e-liquids safer for Hoosiers,[12] it is not our place to judge whether the General Assembly was right or wrong in its belief that the Act will prevent threats to public health and safety.  Rather, we must determine whether the legislature *could* have rationally believed that the Act would make e-liquids safer.  *K-S Pharms.*, 962 F.2d at 731 ("The dormant commerce clause does not call for proof of a law's benefits, after the fashion of substantive due process, whenever the subject is trade. On the contrary, legislation regulating economic affairs is within public power unless the rules are so silly that a justification cannot even be imagined.").  Respondents easily pass over this low threshold to satisfy a rational basis for the Act's requirements.  For these reasons, we conclude that the Act, specifically the security, clean room, and audit requirements, does not violate the Dormant Commerce Clause.

## II.    Federal Equal Protection – Open System E-liquid Regulation

The parties agree that the Act applies only to e-liquids manufactured for use in open system vapor devices.  Petitioners contend that no rational basis exists to justify the Act's applicability to e-liquids manufactured for use in open system devices, but not e-liquids manufactured for use in closed system devices.  It is their position that all e-liquid products are made with the same ingredients and manufactured using the same processes; thus to

---

[12] For example, Petitioners argue that the risks addressed by the security and clean room requirements, to wit, adulteration and sabotage, have a very low probability of actually manifesting themselves and Respondents are unaware of e-liquids shipped or sold in the United States that have been tampered with of sabotaged.  [Pet. Resp./Reply Br. at 2-3.]

distinguish between these two groups, they say, violates the Equal Protection Clause.  [Pet.
Br. in Supp. at 37.]

Citing the deference to be granted acts promulgated by the legislature, Respondents
rejoin that the General Assembly is free to deal with perceived problems in a piecemeal
fashion.  [Resp. Cross-Mtn. Br. at 29.]  Respondents argue that because the vast majority
of closed system e-liquid manufacturers are already regulated under tobacco laws, it is
reasonable for the Indiana General Assembly to focus its efforts on a single segment of the
e-liquid market.  [*Id*. at 30-33.]

The Fourteenth Amendment provides in pertinent part, "No State . . . shall deny to
any person within its jurisdiction the equal protection of the laws." U.S. Const., amend
XIV, cl. 1. The purpose of the Equal Protection Clause is to "secure every person within
the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned
by express terms of a statute or by its improper execution through duly constituted agents."
*Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (citation omitted); *see also Martin
v. Shawano-Gresham Sch. Dist.,* 295 F.3d 701, 713-14 (7th Cir. 2002).  In addressing the
analysis of classifications arising in Equal Protection cases, the Supreme Court explained
in *Nordlinger v. Hahn,* 505 U.S. 10 (1992), that: "[t]he Equal Protection Clause does not
forbid classifications.  It simply keeps governmental decisionmakers [sic] from treating
differently persons who are in all relevant respects alike."  *See also Vacco v. Quill,* 521
U.S. 793, 799 (1997), (the Equal Protection Clause "embodies a general rule that States
must treat like cases alike").  The government may thus classify persons and make
distinctions in the creation and application of laws, but those classifications may not be

based on "impermissible criteria or arbitrarily used to burden a group of individuals." *Little Arm, Inc. v. Prosecutors: Adams*, 13 F. Supp. 3d 893, 912 (S.D. Ind. 2014) (citation omitted).

Legislation which neither burdens a fundamental constitutional right nor targets a suspect classification will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate state interest. *Vacco,* 521 U.S. at 799; *Romer v. Evans,* 517 U.S. 620, 631 (1996). Under the rational basis test, which the parties agree applies in this case, "the government's action simply 'cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose.'" *Smith v. City of Chicago,* 457 F.3d 643, 652 (7th Cir. 2006) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356 (2001)) (emphasis added). The government is not required to articulate the legitimate interest at the time of a statute's adoption; rather, "the burden is upon the challenging party to eliminate 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Heller v. Doe,* 509 U.S. 312, 320 (1993)). Moreover, because the rational basis test "is not subject to courtroom fact-finding," the government's reasons may be based even on "rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307 (1993). Once a plausible basis for the legislation is identified, the inquiry by a court is at its end. *U.S. R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179 (1980). When dealing with a local economic regulation, the test becomes even more indulgent of the State's interests; in those cases "'it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the

27

Fourteenth Amendment.'"  *Goodpaster v. City of Indianapolis,* 736 F.3d 1060, 1071 (7th

Cir. 2013) (quoting *Listle v. Milwaukee Cty.*, 138 F.3d 1155 (7th Cir. 1998).  The import

of the rational basis standard is that Petitioners must overcome a tall hurdle to prove that

the Act violates the Equal Protection Clause.

    In support of its argument that no rational basis exists for regulating open system e-

liquids, while impliedly not regulating closed system e-liquids, Petitioners point to a trio

of cases referred to as the "filled milk" decisions from the 1970s.  [Pet. Br. in Supp. at 39-

43 (citing *Milnot Co. v. Douglas*, 452 F. Supp. 505 (S.D. W.Va. 1978) (challenging a West

Virginia statute); *Milnot Co. v. Arkansas State Bd. of Health*, 388 F. Supp. 901 (E.D. Ark.

1975) (challenging a nearly identical Arkansas statute); *Milnot Co. v. Richardson*, 350 F.

Supp. 221 (N.D. Ill. 1972) (5th Amendment challenge to the Filled Milk Act, 21 U.S.C.

§61-64).]  *Douglas* and *Arkansas* are factually very similar as well as the statutes at issue

and the respective courts' analyses.  In those cases, state statutes imposed an absolute

prohibition on the sale of "filled milk", defined as milk which has had all or the greater

part of the butterfat removed and some other oil or fat substituted in lieu thereof.  *Arkansas*,

388 F. Supp. at 902; *Douglas*, 452 F. Supp. at 506.  In both cases, the regulatory body

banned the sale of Milnot (a product consisting of fat free milk, soya oil, and vitamins A

and D) based on the statutory prohibition, while at the same time it allowed the sale of

other products that fell within the statutory definition of "filled milk".  *Arkansas*, 388 F.

Supp. at 904; *Douglas*, 452 F. Supp. at 508-09.  The regulatory body could not provide a

rational basis for treating Milnot differently from other products that constituted "filled

milk" under the language of the statutes at issue causing courts to conclude that Milnot was

denied equal protection of the laws as guaranteed by the Fourteenth Amendment. *Arkansas*, 388 F. Supp. at 905; *Douglas*, 452 F. Supp. at 509.

Petitioners contend that as with the "filled milk" products, all e-liquids contain the same ingredients and are manufactured using the same processes in the same type of facilities. As a result, following the analysis in the "filled milk' cases, no rational basis exists for treating closed system e-liquids differently from their similarly situated counterpart, open system e-liquids. [Pet. Br. in Supp. 37-41.] This analogy, however, ignores a critical distinguishing fact, to wit, the "filled milk" cases involved "as applied" challenges to their respective state statutes; those courts were not asked to and therefore did not conclude that the statutes were facially unconstitutional. In the "filled milk" cases, it was the administrative application of the statutes that denied Milnot equal protection under the law. In our case, if the Act regulated the manufacturing of all e-liquids and the ATC enforced the law only as to open device e-liquids, the "filled milk" cases would likely be applicable. Here, however, Petitioners ask us declare the Act facially unconstitutional, and, as a result, the facts, analysis, and conclusion of the "filled milk" cases are inapposite to our analysis.

The Respondents and Amici explain that the manufacturing of e-liquids differs widely between closed system devices and open system devices, and more e-liquid consumers use open devices. [Amici Br. at 7-8; Resp. Cross-Mtn. Br. at 30-31.] Where only five cig-a-like brands have captured 85% of the closed system e-liquid market, the production of open-system e-liquids resulted from a "grassroots effort[] by hobbyists, consumers, and entrepreneurs to create and sell a class of products;" indeed, an estimated

46% of e-liquid revenue comes from "private labels", i.e., brands that are owned by a retail business.  [Declaration of Steve Hong, founder of Roebling Research LLC, ¶¶ 116, 233-37.]  As Amici argue, "[p]roliferation of open-system e-liquid makers and products compromises reliability and safety."  [Amici Br. at 2-3.]

According to a Declaration submitted by Petitioners, "the vast majority of [members in a smoke-free alternative association] prefer the open-system products as a superior alternative to cigalikes."  [Declaration of Julie T. Woesnner, President of the Board of Directors and the Executive Director of The Consumer Advocates for Smoke-free Alternatives Association (an organization with more than 100,000 members, more than 3,000 of whom live in Indiana) ¶ 24.]  It is entirely rational for the General Assembly to regulate the sale of e-liquids in a manner that will make the greatest impact on the health and safety of its citizens.  Because a greater percentage of the e-device consumer market uses open system devices and liquids (60% as opposed to 40% using closed system devices), the Act regulates the e-products in greater use in Indiana, which in turn protects a greater percentage of its citizens.  As the Supreme Court explained more than fifty years ago, "[t]he prohibition of the Equal Protection Clause goes no further than the invidious discrimination", in other words, the legislature may regulate to address the most acute phase of the problem or one step at a time, neglecting other phases of the problem. *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487-89 (1955).  Indiana has done just that in regulating open device e-liquids while leaving unregulated the manufacture of closed e-liquid.

As a related justification for not regulating the manufacture of closed system e-liquids in the Act, Respondents explain that four out of the five manufacturers of 85% of closed-system e-liquids are owned by tobacco companies.  Although Petitioners protest, quite vehemently, that the federal tobacco laws do not regulate e-liquids, this is not Respondents' contention.  [*See* Pet. Resp./Reply Br. at 22-25.]  The carefully-worded argument advanced by Respondents is that tobacco companies are highly regulated and that the tobacco regulation's efforts to avoid adulteration, contamination, and tampering would be transferrable to those companies' manufacture of e-liquids, even if tobacco manufacturers use facilities separate from closed e-liquid manufacture.[13]  [*See* Resp. Cross-Mtn. Br. at 30-31.]  Respondents take this logic a step further, arguing that for the manufacturers of e-liquids for closed systems that are not owned by tobacco companies, some of those manufacturers produce e-liquids for both open and closed systems, and their processes would be similarly impacted by the Act.  [*Id.*]  Thus, a plausible basis exists to justify the General Assembly's approach to regulate the manufacture of the e-liquids for open systems that is sold in Indiana wherein the manufacturers are considered to be largely unregulated at all.  By attacking the Act on rational basis ground, Petitioners have the burden to negate "every conceivable basis which might support it."  *Goodpaster v. City of*

---

[13] According to Petitioners, "[m]ost traditional tobacco companies that also make e-liquids for closed e-vapor systems do not produce e-liquids in the same facilities as other products (*e.g.,* cigarettes).  Rather, they either maintain a separate facility for e-liquid production or subcontract with an independent manufacturer."  [Pet. Resp./Reply Br. at 5 (citation omitted).]

*Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).  The Petitioners have not met that burden.

Having found a plausible basis for the legislation, our inquiry is complete.  *Fritz*, 449 U.S. at 179.  The Act does not violate the Equal Protection Clause.

## III.   Indiana Privileges and Immunities – Open v. Closed Systems

Article 1, Section 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."   The Indiana Constitution "imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons" as detailed in *Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994).   "First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated."  *Id.*

Under the first prong:

legislative classification must be based upon substantial distinctions germane to the subject matter and the object to be attained.  The distinctions must involve something more than mere characteristics which will serve to divide or identify a class.  There must be inherent differences in [the] situation related to the subject-matter of the legislation which require, necessitate, or make expedient different or exclusive legislation with respect to the members of the class.

*Id.* at 78-79 (also noting that distinctions must be "just," "natural," "reasonable," "substantial," "not artificial," "not capricious," and "not arbitrary.") (citations omitted). With regard to the second prong, a statute will be found to be in violation if it "creates a

preference, and establishes an inequality among a class of citizens of all of whom are equally meritorious" or which "applies to persons in certain situations, and excludes from effect other persons who are not dissimilar in these respects." *Id.* at 79 (citation omitted). As with federal law, courts must give substantial deference to legislative discretion and proceed with a presumption of constitutional validity. *Id.* at 80; *Boehm v. Town of St. John,* 675 N.E.2d 318, 321 (Ind. 1996).

In contending that the Act violates Article I, Section 23 of the Indiana Constitution, Petitioners rely on the same arguments that they advanced in support of their Equal Protection claim. [Pet. Br. in Supp. at 43-45; Pet. Resp./Reply at 34-35.] Not surprisingly, Respondents repeat their arguments that, like the Equal Protection Clause, the Act does not violate the Indiana Constitution. [Rep. Cross-Motion/Resp. Br. at 39-41.] Petitioners and Respondents bolster their Equal Protection arguments with Indiana caselaw in support of their respective positions. [Pet. Br. in Supp. at 44-45 (citing *State Board of Barber Examiners v. Cloud*, 220 Ind. 552 (1942)) (analogizing this case with the holding in *Cloud* that regulating barbers' hours of operation and minimum pricing was unrelated to purported health and sanitation goals and that no reason existed to single out barbers as a class); Resp. Cross-Mtn./Resp. Br. at 34-35 (citing *State v. Price*, 724 N.E.2d 670, 675-76 (Ind. Ct. App. 2000)) (analogizing this case to the holding in *Price* that a seat belt law applicable to cars, but not trucks or recreation vehicles did not violate the Privileges and Immunities Clause, because in part, an inherent distinction existed, to wit, trucks and recreational vehicles provide more structural protection than cars).]

33

Respondents have demonstrated that closed device e-liquids are distinguishable from open device e-liquids. First, more e-liquid consumers use open device e-liquid. Second, manufacturers of e-liquids are unregulated, as compared to the majority of closed device manufacturers who are regulated through their tobacco production. [Resp. Cross-Mtn./Reply Br. at 35 (Respondents argue that "by regulating open system, nearly all closed system would also be manufactured in a facility that was highly regulated by either Indiana Statute or tobacco regulations.").] Third, closed device e-liquids are manufactured in large part by five manufacturers, four of whom are regulated for their tobacco production, whereas open device e-liquids are manufactured by countless individual retail vape shops. The prolific unregulated production of open device e-liquids can easily threaten to compromise reliability and safety of the product.

Petitioners repeat their theme that no rational distinction exists between open device and closed device e-liquids because they contain the same ingredients and are manufactured in the same way often in the same facilities. They have failed, however, to negate every conceivable basis for the Act's regulation of open e-liquids, as opposed to closed e-liquids, as is required under a rational basis standard. *Collins*, 644 N.E.2d at 80. We accord substantial deference to the Indiana General Assembly's discretion to make a just, reasonable, and non-arbitrary distinction between e-liquids that furthers the purpose of the Act. Petitioners' arguments and contentions have failed to overcome the presumption of the Act's constitutional validity.

Following the briefing by the parties of their cross-motions for summary judgment, the Marion Superior Court (the "State Court") issued an Order on a Motion for Preliminary

34

Injunction sought by Hoosier Vapers, Inc. against the ATC, Cause No. 49D04-1512-PL-41749 (the "State Case").  [Dkt. No. 102-1.]  Identical Indiana constitution-based challenges were raised in that State Case.  In its order dated June 1, 2016, the State Court issued the following conclusions of law:

> 54. The Court finds, in the case at bar, that the General Assembly chose several rationally-related inherent characteristics of the two different classes of e-liquid manufacturing methodology, based on an aim to protect the public consumer, in order to distinguish between e-liquids manufactured for use in open systems and e-liquids manufactured in closed systems that justify differential treatment.
>
> 55. The [General Assembly] was able to observe that a large portion of e-liquids for closed systems were already being manufactured by highly-regulated tobacco companies. The top five closed-system brands in the country control about 85% of the market for those devices, and four of the top five brands are owned by tobacco companies. The General Assembly members were advised, during consideration of Public Law 176, that open-system e-liquid manufacturers were a public health and safety problem. They were shown definite inconsistencies in the contents of open system e-liquids being manufactured by vape shops similar to those operated by some of the Plaintiffs in this lawsuit. Therefore, based on essential differences between these products, it was not irrational for the Legislature to believe that is was only necessary to currently regulate the manufacturers of open system-liquids. The majority of closed-system manufacturers were already regulated as being tobacco manufacturers. The import of the new law is reasonably related to those differences.
>
> . . .[14]
>
> 57. With deference to General Assembly's choice in regulating only open-system e-liquid manufacturers, the Court does not find that the ACT violates Article 1, Section 23 of the Indiana Constitution. The Court will not substitute is judgment for that of the Legislature.

---

[14] The State Court found that "closed-system devises are already regulated."  [State Court Order ¶ 56.] As discussed above, the evidence and arguments of the parties here demonstrate that closed system devices are not regulated, although a large percentage of their manufacturers are regulated as a result of their tobacco manufacture.

The parties have not addressed the practical effect of the State Court's Order;[15] however, we take proper notice of this ruling which accords with our own judgments.[16] Though merely a preliminary ruling rather than a final adjudication on the merits, it has some relevance here.  Based on the reasons explained above, we hold that the Act does not violate Indiana's Privileges and Immunities Clause.

## IV.   E-liquids Defined as a "Tobacco Product" and Required Sales Certificates

Petitioners challenge the Act's definition of "tobacco product" because it includes e-liquids.  It is their contention that this definition violates the Due Process Clause,[17] Equal Protection Clause, and Indiana's Privileges and Immunities Clause because, as Petitioners have said it, no rational basis exists for such a definition.  [Pet. Br. in Supp. at 46-47.] Definitions and classifications drawn by a legislative body are entitled to considerable judicial deference and subject to the rational basis standard.  [Pet. Br. in Supp. at 46 (citing to *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Johnson v. Daley*,

---

[15] In the final pages of an objection to additional intervenors joining this litigation, Petitioners bury an argument that the State Court Order is not dispositive.  [*See* Dkt. No. 103 at 14-16.] Respondents have not had the opportunity to respond to Petitioners' view of the State Court Order, to the extent they are even aware of it.  In any event, we are not suggesting that the State Court Order is in any sense dispositive.

[16] Considering the issue *sua sponte*, we do not believe that the circumstances before us trigger the doctrine of *Pullman* abstention because the Act is not unclear (nor do the parties claim it is unclear).  *See Brownsburg Area Patrons Affecting Change v. Baldwin*, 943 F. Supp. 975, 989 (S.D. Ind. 1996) (abstention under the *Pullman* doctrine required when an unclear state statute is "'fairly susceptible' to an interpretation that would avoid or substantially alter the constitutional issue").

[17] The Due Process Clause, Section 2 of the Fourteenth Amendment, prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  The level of scrutiny applied under a Due Process analysis is the same as our previously-stated Equal Protection analysis.  *Eby–Brown Co., LLC v. Wis. Dept. of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002); *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000).

339 F.3d 582, 587 (7th Cir. 2003); *see also* Resp. Cross-Mtn. Br. at 36.]   However, a statutory classification which "manifests a patently arbitrary classification, utterly lacking in rational justification" will be found to violate the Due Process Clause. *Flemming v. Nestor*, 363 U.S. 603 (1960); *United States v. Arango-Montoya*, 61 F.3d 1331 (7th Cir. 1995).

Following the filing of Petitioners' claims, the Act was amended by House Enrolled Act 1035, as follows:

> (b) "Tobacco product", for purposes of IC 7.1-3-18.5, means a product that:(1) contains tobacco, including e-liquid (as defined by IC 7.1-7-2-10) that contains ~~tobacco~~ **nicotine**; and (2) is intended for human consumption.

Ind. Code § 7.1-1-3-47.5(b), amended by HEA 1035.   Despite the amendment clarifying that e-liquids contain *nicotine* (not tobacco), by including e-liquids in the definition of "tobacco product", e-liquid retailers will be required to obtain a Tobacco Sales Certificate. *See* IC 7.1-7-5-1(c); IC 7.1-3-18.5-1.[18]

---

[18] Petitioners final claim and argument in their Motion for Summary Judgment is that the Act "now requires open system e-liquid retailers (*e.g.*, vape shops) to obtain a [Tobacco Sales] Certificate by July 1, 2015." No such requirement exists for closed system e-liquid retailers, they stress. [Pet. Br. in Supp. at 50-51.] This argument is simply a continuation of Petitioners' previously-stated positions that have been rejected based on a rational justification for regulating open and closed e-liquids differently. Petitioners argue: "For the same reasons that Indiana statute's distinction between open and closed system e-liquids violates notions of equal protection . . . so too does the different classification of retailers selling those products." [*Id.* at 55.] We repeat: it would have been rational for the General Assembly to believe that closed system e-liquids were being sold alongside tobacco products which already required a Tobacco Sales Certificate. Indeed, Petitioners argue that closed system e-liquids are often sold with tobacco cigarettes [Pet. Br. in Supp. at 6], whereas open system e-liquids are sold in thousands of vape shops across the country that "generally do not sell tobacco products." [*Id.* at 14]. Petitioners' arguments do nothing to overcome the General Assembly's rational speculation, despite that speculation being unsupported by evidence or empirical data. *See Beach Commc'ns*, 508 U.S. 307 (1993). Accordingly, we conclude that a rational justification exists to require retailers of open e-liquid, but not closed e-liquids, to obtain a Tobacco Sales Certificate.

It is undisputed that e-liquids do not contain tobacco and that nicotine is not a form of tobacco. Because the above-quoted definition equates nicotine with tobacco, Petitioners challenge the definition as "factually unsupported, and [] thus without any rational basis." [Pet. Br. in Supp. at 47; Pet. Resp./Reply Br. at 31-33.][19]

Respondents rejoin that a rational justification for defining e-liquids as "tobacco products" exists. Specifically, during the hearings before the House Committee on Public Policy, the President of the Indiana Grocery and Convenience Store Association, Joe Lackey, argued that by treating e-liquids as tobacco products, grocers can ensure that the products they sell are safe. [Resp. Cross-Mtn. Br. at 36-37.] According to the Committee Report, Mr. Lackey opined that "all nicotine should be included [as tobacco products] and that the FDA will eventually regulate [e-liquids] like tobacco." [*Id.* at Ex. C at p. 8.] Although its definition does not mention "nicotine," the FDA defines "tobacco product" to include "any product made or *derived* from tobacco that is intended for human consumption," which arguably includes nicotine. 21 U.S.C. § 321(rr)(1).[20] Petitioners

---

[19] Petitioners rely on *Prestonia Area Neighborhood Ass'n v. Abramson*, 797 S.W.2d 708, 712 (Ky 1990) in support of their argument that the Indiana General Assembly's definition of e-liquids as tobacco products are akin to legislatively declaring an apple to be an orange. [Pet. Br. in Supp. at 48.] We fail to perceive *Prestonia*'s is relevance to the facts and issues here. In that case, the court was analyzing whether substantial evidence supported an urban renewal ordinance. Neither the facts, issues, nor standard of review mirrors the case before us.

[20] The parties draw our attention to a 2014 *proposed* Federal Drug Administration regulation known as the "Deeming Rule." If adopted, the Deeming Rule would deem all products meeting the definition of "tobacco product" subject to the Tobacco Control Act. As a result, e-liquids containing nicotine derived from tobacco used for open and closed devices would be regulated by the FDA. 79 Fed. Reg. 23,142 (Apr. 25, 2014). Although Petitioners suggest a preemption claim may be possible in the future on this basis, [Pet. Resp./Reply Br. at 24], as of the date of this Order,

concede that "e-liquids typically contain nicotine derived from tobacco plant[, although it] is completely distinct from tobacco." [Pet. Br. in Supp. at 13; *see also id.* at 14 (noting that nicotine is pharmaceutical smoking cessation products are not considered "tobacco products" under federal law).] These two items of evidence provide a rational justification, or at the very least "rational speculation," for defining "tobacco product" to include e-liquids containing nicotine. Respondents have provided the requisite justification to avoid a violation of the Due Process and Equal Protection Clauses. As previously stated, our inquiry ends when a plausible basis for the legislation is identified. *Monarch Beverage Co. v. Grubb*, 138 F. Supp. 3d 1002, 1010 (S.D. Ind. 2015). The Act and Indiana Code 7.1-3-18.5-1, as amended, does not violate the Due Process Clause, Equal Protection Clause, or Indiana's Privileges and Immunities Clause by defining e-liquids as tobacco products.

### Conclusion

For all the reasons stated herein, we hold that the Act does not violate the Dormant Commerce Clause, Equal Protection Clause, or Indiana Constitution. Accordingly, we **DENY** Petitioners' Motion for Summary Judgment [Dkt. No. 56]. We **GRANT** Respondents' Cross-Motion for Summary Judgment. [Dkt. No. 70.] Because Petitioners' Motion for Preliminary Injunction raises the same issues as their Motion for Summary Judgment and was conditioned on a finding that the Act is unconstitutional (which we did

---

we assume the Deeming Rule has not been adopted by the FDA. Thus, we will not address any possible implications that the proposed Deeming Rule may in terms of the Act.

not find), we **DENY** Petitioners' Motion for Preliminary Injunction [Dkt. No. 55] as

**MOOT**.  Final judgment shall enter accordingly.


Date:   _____6/30/2016_____

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

All cm/ecf counsel of record

40